# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN B. LINDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  14-cv-2714 |
| | ) | |
| DARRYL McPHERSON, KEVIN | ) | |
| SHIRLEY, AEJEAN CHA, MARK | ) | |
| BLUMBERG, and the UNITED STATES | ) | |
| OF AMERICA | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Defendants' Darryl McPherson, Kevin, Shirley, Aejean Cha, and Mark Blumberg ("the Individual Defendants") Motion to Dismiss (Doc. 13) and the United States' Motion to Dismiss (Doc. 23). Plaintiff filed responses in opposition (Docs. 19, 27), to which the respective Defendants filed replies (Docs. 24, 28). For the reasons stated below, both motions are granted.

## INTRODUCTION AND PROCEDURAL HISTORY

This case emerges from the United States' failed prosecution of Deputy United States Marshal Stephen B. Linder ("Plaintiff" or "Linder"). A grand jury indicted Linder on January 2012 on charges of excessive force and tampering with witnesses. The indictment was based, in part, on allegations that Linder had used excessive force against the father of a fugitive on July 8, 2010. On March 5, 2013, Judge Virginia Kendall of the Northern District of Illinois dismissed the indictment against Linder on the ground that government employees involved in the

prosecution had violated his Sixth Amendment right to compulsory process of witnesses and his Fifth Amendment right to due process. Linder has brought this Complaint based on the actions taken by Defendants as part of this prosecution. Linder alleges, among other things, that Marshal McPherson conducted an improper preliminary investigation, improperly assisted in the subsequent investigation of the incident, and sent an improper email which instructed United States Marshal Services ("USMS") employees to not speak with Linder or his attorneys. Linder alleges that Shirley, Cha, and Blumberg intimidated and coerced witnesses into providing false information about the incident, intimidated witnesses so that they would not cooperate with Linder and his defense team, and that Shirley submitted affidavits in the criminal case that contained knowingly false statements.

Plaintiff filed his first Complaint pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) on April 15, 2014, alleging that the Individual Defendants violated his rights under the Fifth and Sixth Amendments. (Doc. 1). On August 7, 2014, Plaintiff amended his Complaint to add claims against the United States under the Federal Torts Claims Act (FTCA) for malicious prosecution and intentional infliction of emotional distress. (Doc. 12). All Defendants named in the First Amended Complaint have filed Motions to Dismiss for failure to state a claim upon which relief can be granted. (Docs. 13, 23).

Linder began his employment with the USMS in April of 2003. Starting in 2007, he worked as part of the Great Lakes Regional Task Force ("Task Force"), a USMS-led conglomerate of law enforcement agencies tasked with capturing violent fugitives in and around Chicago.

On July 8, 2010, Linder and other Task Force members were in Cicero, Illinois, searching for a fugitive who was wanted for murder. As part of the investigation, Linder questioned Santiago Solis, the fugitive's father, in the back seat of a passenger van. Secret Service Agent Eric Petkovic and Deputy U.S. Marshal Harry Sims were both seated in the front of the van while Linder questioned Solis. Two days later, Sims reported to another Deputy Marshal, Deputy Stenson, that he had seen Linder strike Solis. Sims prepared a report charging that Linder had used excessive force during his interview of Solis, and submitted it to Deputy U.S. Marshal Ken Robinson. Sims later told Stenson that he had "jumped the gun" by filing the report that Linder used excessive force, and that he had not filed an accurate and complete report.

---

[1] Applying the legal standard set forth below, the facts are taken from Plaintiff's Amended Complaint and all reasonable inferences are drawn in his favor. In their Motions to Dismiss, Defendants requested that the Court also consider a number of documents that it argues Plaintiff incorporated into his Complaint by reference. This includes materials filed in Plaintiff's criminal case, *United States v. Linder*, No. 1:12-CR-22 (N.D. Ill.), Judge Kendall's findings of fact in her order dismissing Plaintiff's indictment, *United States v. Linder*, No. 12-cr-22, 2013 WL 812382 (N.D. Ill. Mar. 5 2013), and certain testimony from the hearing Judge Kendall held on the motion to dismiss the indictment. The facts that Defendants wish to introduce are not material to the Court's decision. Therefore, the Court does not consider them. The only additional document that the Court will consider is U.S. Marshal's Policy Directive 2.2, which Plaintiff incorporates by reference into his Complaint and upon which both Plaintiff and the United States rely in their briefs. (*See* Docs. 23, 27).

After receiving Sims' report, Robinson referred it to U.S. Marshal Daryl McPherson and Chief Deputy Marshal John O'Malley. O'Malley referred the report to the USMS Office of Inspection, and McPherson then became personally involved in investigating Sims' allegations. First, he summoned Linder to his office and questioned him. During this questioning, neither McPherson nor any of the other USMS employees that were present advised Linder of any rights he might have. Later, McPherson directed two Deputy U.S. Marshals – Paul Banos and Rick Walenda – to interview Solis, the alleged victim. Banos and Walenda interviewed Solis in Cicero on July 13, 2010. They reported to McPherson that Solis did not say anything about an alleged assault until the third time he was asked about it, and then said that a Cicero police officer had hit him. They also reported that Solis did not have any injuries to his face, and provided McPherson with pictures of his face. McPherson sent Banos and Walenda back to Cicero to take more pictures of Solis. McPherson reassigned Linder from the Task Force to the USMS District Office on July 15, 2010.

The USMS referred the complaint that Linder had used excessive force to the Department of Justice's Office of the Inspector General. On July 26, 2010, the OIG announced that it would conduct an official investigation into the complaint. Defendant Special Agent Kevin Shirley conducted the investigation. The Complaint alleges that McPherson assisted Shirley in conducting the investigation in a number of ways, and that the two regularly communicated by email or telephone during an 18-month investigation. As part of his investigation, Shirley first enlisted McPherson's help to "ambush" Linder and interrogate him in an effort to

get him to confess. At Shirley's request, McPherson told Linder that he needed to meet with him. Once Linder arrived to meet with McPherson, McPherson brought him to meet with Shirley and quickly left.

Shirley later enlisted McPherson's help in having him confiscate Linder's phone and also in helping him set up meetings with USMS witnesses he wished to interview. Specifically, Shirley notified McPherson of the employees he wished to interview. McPherson then notified the employees that they would be interviewed by Shirley and other OIG agents. Shirley allegedly preferred that interviews be set up this way, because USMS witnesses were less likely to decline a voluntary interview with the OIG after their boss notified them about it.

Shirley, along with Assistant U.S. Attorneys Cha and Blumberg, interviewed dozens of witnesses. Linder alleges that Shirley, Cha, and Blumberg attempted to get witnesses to testify favorably for the government and discourage them from testifying in favor of Linder. He also alleges that they intimidated and harassed witnesses into changing their stories.

A number of witnesses complained about the manner in which Shirley, Cha, and Blumberg treated them. For example, Ed Farrell, who oversaw the Task Force, reported that the three conducted their interview with him in a confrontational manner, accused him of lying, alleged that he had engaged in wrongdoing, and made misrepresentations about the availability of immunity. Lieutenant Ted Stajura testified that Shirley threatened to bring him before the grand jury on bogus charges. Cook County Sheriff's Department Chief of Police DeWayne Holbrook complained that Shirley engaged in a pattern of intimidation during his

interviews. Berwyn Police Detective John Hadjioannou testified that Shirley intimidated him during his first interview, and AUSA Blumberg accused him of being a liar and threatened him with consequences in a second interview.

The United States secured an indictment against Linder on January 12, 2012. Following the indictment, McPherson sent an email to all USMS staff in the Northern District of Illinois that instructed them on "specific rules that must be adhered to by USMS employees during the pendency of federal criminal proceedings against a DUSM from our district." (Doc. 12 at ¶ 36). Specifically, the email instructed USMS to restrict personal contact and socialization with Linder and instructed them to not discuss the case with Linder's attorneys without prior approval from USMS management. McPherson reviewed and approved a second email which was sent on February 2, 2012. This email supplemented the original guidance and warned USMS staff that failure to comply with the original guidance would "be dealt with through the U.S. Marshals Service's official discipline process and Employee Relations." (*Id.* at ¶ 37). Linder was put on indefinite suspension without pay on March 13, 2012.

Linder moved to dismiss the indictment on April 20, 2012, after his defense team unsuccessfully attempted to interview nine potential witnesses. Prior to a hearing on the motion to dismiss the indictment held on September 18, 2012, Shirley prepared affidavits for a number of USMS employees after meeting with them to discuss their willingness to meet with Linder's defense team. The affidavits, which were filed in the criminal proceeding, each contained a statement that the employee did not have information that could be helpful to the defense. Linder

alleges that with respect to two employees – Deputy Paul Zitsch and Banos – these statements were knowingly false.

During the hearing, a number of witnesses testified that they refused to speak with Linder's defense team because of the emails sent by McPherson, which they characterized as defining a U.S. Marshal policy that they not speak with the defense team, and the tactics of Shirley, Cha, and Blumberg. Judge Kendall dismissed the indictment on March 5, 2013.

## LEGAL STANDARD

In ruling on a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient detail to give notice of the claim, and the allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The plausibility standard requires enough facts "to present a story that holds together," but does not require a determination of probability. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Though detailed factual allegations are not needed, a "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*, 550 U.S. at 555.

Linder's four-count Complaint can be divided into two sections. In Counts I and II, Linder states constitutional torts against the Individual Defendants. In Counts III and IV, Linder states common law torts against the United States pursuant to the FTCA. As explained in more detail below, Counts I and II are dismissed for the same reason: Linder has failed to allege constitutional injury and the Individual Defendants would be entitled to qualified immunity. Similarly, Counts III and IV are also dismissed for the same reason: the claims are based upon discretionary actions engaged in by McPherson and Shirley, all of which are exempt from FTCA liability.

## I. Counts I and II – *Bivens* Claims Against the Individual Defendants

Plaintiff's first two claims are *Bivens* claims against McPherson, Shirley, Cha, and Blumberg for alleged violations of his Fifth and Sixth Amendment rights. Defendants have moved to dismiss these Counts under two theories. First, they argue that no *Bivens* remedy exists for these sorts of alleged constitutional violations, and that it would be inappropriate in these circumstances to create a new one. Second, they argue that Plaintiff's *Bivens* claims, should they be appropriate, are barred by qualified immunity. The Court assumes without deciding that *Bivens* provides a cause of action in these circumstances, but concludes that the Individual Defendants are entitled to qualified immunity.

### A. Whether a *Bivens* Cause of Action Exists

The parties have expended a substantial amount of ink arguing over the appropriateness of a *Bivens* remedy in this circumstance. In *Bivens*, the Supreme

Court recognized an implied private right of action for damages against federal officers alleged to have violated a person's Fourth Amendment rights. 403 U.S. at 397. As the Individual Defendants point out, *Bivens* remedies are disfavored. *See Correctional Srvs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) (observing that the Supreme Court has extended the *Bivens* holding only twice in 30 years, and otherwise "consistently rejected invitations to extend *Bivens*"). This is because the theory under which *Bivens* was decided has fallen out of favor with federal courts. *See Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011)(explaining that "the concept that for every right conferred by federal law the federal courts can create a remedy above and beyond the remedies created by the Constitution, statutes, or regulations" is no longer in favor).

The Supreme Court, in *Wilkie v. Robbins*, synthesized its case law on implied private rights of action for damages for constitutional violations. *See* 551 U.S. 537, 550 (2007). It explained that "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee," and provided two steps for courts to consider before creating new *Bivens* remedies. *Id.* First, courts must consider whether "any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* Second, "courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.*

There is currently no *Bivens* remedy recognized for constitutional violations such as those alleged by Plaintiff, and it is unclear to the Court whether a *Bivens* action is appropriate in these circumstances.[2] Although *Bivens* actions are disfavored, the Court is not convinced that the Seventh Circuit would not authorize such a claim in this context.

The Court first considers whether there is an alternative remedial scheme available to Plaintiff. *See Wilkie*, 551 U.S. at 50. The Individual Defendants argue that Plaintiff had an adequate remedy in that he was able to adequately defend himself against criminal charges and "walked, scot-free." (Doc. 13 at 10-11). In support of this position, Defendants rely upon *Wilkie*, where the Supreme Court concluded that a landowner did not have a private right of action against the Bureau of Land Development for retaliating against him when he exercised his ownership rights over land. 551 U.S. at 549-62. In *Wilkie*, the Supreme Court identified four separate groups of difficulties that the plaintiff faced, one of which was "charges brought against him." *Id.* at 551. It concluded that with respect to those harms, the plaintiff "had some procedure to defend and make good on his position." *Id.* at 552. Defendants argue that like the plaintiff in *Wilkie*, the criminal justice system "in fact afforded [Linder] with a remarkably comprehensive and

---

[2] Plaintiff argues that this is not a new context for *Bivens*, and points to the fact that the Seventh Circuit has previously allowed *Bivens* claims based on Brady violations to go forward. (*See* Doc. 19 at 9 (discussing *Manning v. Miller*, 355 F.3d 1028, 1031 n.1 (7th Cir. 2004)). However, the Supreme Court has instructed that *Bivens* remedies should be considered in a context-specific way, even if the alleged violations implicate the same constitutional provision. *See FDIC v. Meyer*, 510 U.S. 471, 484, 484 n.9 (1994). Therefore, the fact that the Seventh Circuit has previously recognized a *Bivens* remedy for Brady violations does not decide the question of whether one is available in this context.

effective means of protecting his rights," along with "an extraordinary remedy" – the dismissal of the indictment. (Doc. 13 at 11).

Defendants' suggestion would leave Plaintiff without the prospect of a compensatory remedy, the availability of which has proved to be important in determining whether an alternative remedy is adequate. In *Wilkie*, the Supreme Court did not limit its discussion of the plaintiff's available remedies to his ability to defend himself. Rather, it also referred to procedures to "defend and make good on his position," which included a possible "state-law action for malicious prosecution," a remedy that is undoubtedly compensatory. 551 U.S. at 552. Similarly, in *Engel v. Buchan*, the Seventh Circuit recently held that a *Bivens* action based upon an FBI agent's *Brady* violation exists, in part because there was no other compensatory remedy available. 710 F.3d 698, 705-08 (7th Cir. 2013). The defendant in that case suggested a number of potential remedial schemes that might provide roughly similar incentives as money damages to the defendants, including habeas corpus. *Id.* at 705-06. The court concluded that habeas corpus is not a proper remedial alternative to a *Bivens* action because it "is limited to securing prospective relief from unlawful incarceration," and does not provide a compensatory remedy. *See id.*

The Individual Defendants attempt to cabin *Engel* by arguing that its holding should only apply to individuals who have been convicted and incarcerated but should not apply to individuals who enjoyed the benefits of the criminal justice system's procedural protections. (*See* Doc. 13 at 14, n.3). They argue that "Linder's situation is thus more like that of the plaintiff in *Wilkie*, whom the Supreme Court indicated would not be entitled to a *Bivens* remedy based on the government's

unsuccessful prosecution of criminal charges." (*Id.*). This is not a stable distinction for two primary reasons. First, as discussed above, the Supreme Court concluded that the plaintiff in *Wilkie* chose not to pursue compensatory remedies that might have been available. Second, it does not make sense to claim that a federal common law remedy should not be created because one particular plaintiff asserting a claim was not incarcerated, as there very well could be future plaintiffs bringing nearly identical claims who were incarcerated and later released. The Individual Defendants' argument says nothing about them. The fact that Plaintiff was not convicted or incarcerated, therefore, should not be a relevant consideration on this point.[3]

The Individual Defendants have not asserted other remedial schemes that might provide Plaintiff with a remedy. Therefore, the *Wilkie* analysis requires that the Court proceed to the second step. Under *Wilkie* step two, a court must "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." 551 U.S. at 554. The Court thinks it is best to save the task of considering these various prudential and structural factors for another day, and proceed under the assumption that a *Bivens* action is available without deciding whether one is.

## B. Qualified Immunity

When the conduct of government officials "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," the officials are shielded from liability by the doctrine of qualified immunity.

---

[3] It is relevant, however, to Defendants' qualified immunity, which will be discussed further below.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even though qualified immunity is an affirmative defense, Plaintiff bears the burden of defeating it. *See Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

Whether the Individual Defendants are entitled to qualified immunity involves two questions: first, whether their conduct violated a constitutional right, and second, whether that right was clearly established at the time it was violated. *Alexander v. McKinney*, 692 F.3d 553, 555 (7th Cir. 2012). "A negative answer to either question entitles the official to the defense." *Id.* at 556.

The Court concludes that the Individual Defendants are entitled to qualified immunity because Plaintiff's alleged injuries are not sufficient to establish that the Individual Defendants violated his constitutional rights.

### 1. Plaintiff's Sixth Amendment Claim Against McPherson

Plaintiff cannot succeed on his Sixth Amendment claim against McPherson because he was not convicted at trial. In fact, Plaintiff did not even proceed to trial, as Judge Kendall dismissed the indictment before one began.

In support of his argument that the Individual Defendants violated his right to compulsory process of witnesses, Plaintiff relies upon *Newell v. Hanks*, 283 F.3d 827 (7th Cir. 2002). *Newell* is a habeas corpus case, in which a convicted defendant challenged the propriety of his conviction after trial. *Id.* at 829. The petitioner claimed the government violated his Sixth Amendment right to compulsory process, because the prosecutor offered to dismiss pending cocaine charges against a defense witness if he did not testify. *Id.* at 837-38. Indeed, each of the other cases upon which Plaintiff relies for his Sixth Amendment claim involve criminal defendants who

were tried in front of and convicted by a jury. *See United States v. Heller*, 830 F.2d 150 (11th Cir. 1987); *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979); *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976); *Gregory v. United States*, 369 F.2d 185, 188-89 (D.C. Cir. 1966) (explaining that a criminal trial is "a quest for truth" and finding that limiting defense counsel's access to witnesses poses problems because it denies defendants a fair trial).

Each of these cases speaks to circumstances in which the government interfered with defendants' Sixth Amendment right to compulsory process of witnesses or Fifth Amendment right to due process by limiting the manner in which defendants could obtain evidence for use at trial. Therefore, these cases, like cases addressing the question of suggestive line-ups, must be considered in the context of the effect that they have on a trial. *See Hensley v. Carey*, 818 F.2d 646,649 (7th Cir. 1987). In *Hensley*, the Seventh Circuit explained that a plaintiff who was identified in an unduly suggestive lineup did not have an actionable claim under § 1983 because the right to be free of an unduly suggestive lineup is a corollary to his right to a fair trial and he was never tried. *Id.* Similarly, the Sixth Amendment right to the compulsory process of witnesses is tied directly to a defendant's ability to tell his story as part of a fair trial. *See Newell*, 283 F.3d at 837; *Gregory*, 369 F.2d at 188.

For this reason, Linder cannot state a claim that McPherson violated his Sixth Amendment right to the compulsory process of witnesses, and his *Bivens* claim based on the Sixth Amendment must be dismissed. *See Hensley*, 818 F.2d at 649; *Alexander*, 692 F.3d at 555.

## 2. Plaintiff's Fifth Amendment Claims Against the Individual Defendants

Linder's Fifth Amendment claims must also be dismissed because he fails to state a cognizable constitutional injury. Specifically, he fails to allege that the Individual Defendants impaired his liberty.

Plaintiff attempts to frame these allegations as a claim for evidence fabrication. Recently, the Seventh Circuit has recognized that plaintiffs can bring due process claims pursuant to § 1983 based on allegations of evidence fabrication. *See Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Fields v. Wharrie*, 740 F.3d 1107, 1113 (7th Cir. 2014). As the Seventh Circuit explained in *Alexander v. McKinney*, a person's due process rights may be violated when improper actions taken by government employees result in a person's conviction or pre-trial detention. *See* 692 F.3d 553, 557 (7th Cir. 2012). In *Alexander*, the Court concluded that the plaintiff could not state a due process claim because he was only detained in connection to his arrest. *See id*. The plaintiffs in *Whitlock* and *Fields*, however, were both incarcerated or detained for substantial periods of time. *See* 682 F.3d at 571, 582 (explaining that plaintiffs, who were held in prison for 21 and 17 years, were harmed because fabricated evidence was instrumental in their convictions); 740 F.3d at 1109 (noting that plaintiff was convicted of two murders and imprisoned for seventeen years). In this case, Plaintiff was never convicted, nor was he detained for a substantial period of time. Therefore, the Individual Defendants did not violate his right to due process because he was not deprived of his liberty. *See Alexander*, 692 F.3d at 557.

Plaintiff has seized on to dicta in *Whitlock* and *Fields* to suggest that he can state a due process violation so long as he can demonstrate that he was deprived of his "liberty in some way," which he argues includes the harm caused by indictment and the harm created when he was placed on leave without pay. *See* 682 F.3d at 580; 740 F.3d at 1112. This argument is based upon misapplication of Seventh Circuit precedent. As Judge Dow explained in *Bianchi v. McQueen*, 12-cv-00364, 2014 WL 700628, *9-11 (N.D. Ill. Feb. 24, 2014), *Whitlock* and *Fields* must be understood in the context of the Seventh Circuit's prior decisions regarding alleged evidence fabrication. Prior to *Whitlock*, Judge Dow explained, "it seemed to be settled law . . . that allegations of evidence fabrication do not state a cognizable due process injury." *Id.* at *9. Rather, a claim based on evidence fabrication was "in essence, one for malicious prosecution, rather than a due process violation." *Id.* (quoting *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009)). Judge Dow explained that after *Whitlock*, any claim based on evidence fabrication that results in post-arrest detention can be brought as a due process violation. However, claims based on evidence fabrication that do not result in post-arrest detention or conviction cannot be brought as due process claims and instead must be brought as malicious prosecution claims. *See id.* at *11.

The dicta upon which Plaintiff relies in *Fields* comes from *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013). In *Julian*, the Seventh Circuit concluded that Indiana's false arrest and false imprisonment laws provided a plaintiff with an inadequate remedy for malicious prosecution and therefore allowed the plaintiff to bring the claim pursuant to § 1983. *Id.* It concluded that damages for malicious

prosecution start with a person's arrest and continue until pending charges are dismissed. *Id.* As Judge Dow explained, *Julian* is among those cases in which a malicious prosecution claim can be brought based upon that harm but a stand-alone due process claim could not be brought in the absence of a conviction or the deprivation of liberty. *Bianchi*, 2014 WL 700628 at *11.

The Court agrees with and adopts Judge Dow's analysis. In each case that Plaintiff cites for the proposition that he can proceed with a due process claim in the absence of a conviction, the plaintiffs were either convicted or subjected to pre-trial detention that deprived them of their liberty. *See Saunders v. City of Chicago*, 12-cv-958, 2014 WL 3535723, *1 (N.D. Ill. July 11, 2014) (allowing plaintiffs to proceed on due process claim where plaintiffs spent more than sixteen years in prison); *Armour v. Country Club Hills*, 11-c-5029, 2014 WL 63850, *2 (N.D. Ill. Jan 8, 2014) (allowing plaintiff who spent fourteen months in pretrial detention to proceed on due process claim); *Bamberg v. City of Evanston*, 13-c-7650, 2014 WL 3953927, *2 (N.D. Ill. Aug. 13, 2014) (plaintiff bringing due process claim held in pre-trial detention for twenty-six months following arrest). Meanwhile, in another case, Judge Lefkow refused to allow a plaintiff's due process claim to go forward even though that plaintiff was convicted of a misdemeanor, because the plaintiff was never detained. *See Miles v. McNamara*, 13-cv-2395, 2014 WL 948884, *6 (N.D. Ill. Mar. 11, 2014). Judge Lefkow, adopting the approach taken by Judge Dow in *Bianchi*, restricted the constitutionally cognizable injury to incarceration. *Id.* Therefore, she concluded that "it cannot be said that [the plaintiff] was deprived of his liberty in the same way as the plaintiffs in *Whitlock* and *Fields* who were all

incarcerated for at least 17 years," because the plaintiff was only detained in connection with his arrest but not in connection to his subsequent conviction. *Id.*

Supposing that Plaintiff has pled a deprivation of liberty sufficient to state a due process claim would not help Plaintiff. Plaintiff argues that he had a liberty interest in his employment as a United States Marshal, which was harmed when he was placed on leave without pay. (Doc. 19 at 16-18). He primarily relies upon an Eighth Circuit substantive due process case, *Moran v. Clarke*, 296 F.3d 638 (8th Cir. 2002), as well as a number of cases from the Northern District of Illinois, which hold that suspension without pay can constitute a deprivation of a liberty interest in violation of procedural due process. *See, e.g., Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 811 (N.D. Ill. 2002). Each of these cases challenges the basis on which an employer took an adverse employment action or the method through which an employer took an adverse employment action. For example, in *Niebur*, the trial court observed that "suspension is manifestly a change of status," for which due process is required. *Id.* And, in *Moran*, the plaintiff alleged that his employer "conspired to and did violate his right to substantive due process under the Fourteenth Amendment" by manufacturing facts that led to adverse employment actions. 296 F.3d at 642. In *Moran*, the plaintiff's substantive due process claim related to the manner in which his employer took the adverse employment action. Namely, after he was acquitted of criminal charges, the police department held an administrative hearing and on the basis of allegedly false evidence, suspended and demoted him. *Id.*

Here, unlike the plaintiffs in *Niebur* and *Moran*, Linder does not challenge the propriety of the adverse employment action taken against him. Instead, he concedes that the adverse employment action was appropriate given the nature of the criminal charges brought against him. (*See* Doc. 19 at 19 (arguing that "it was reasonably foreseeable that [Linder] would be suspended without pay" because a federal statute authorizes the suspension of federal employees, without notice, when "there is reasonable cause to believe [the] employee has committed a crime for which [a] sentence of imprisonment may be imposed.")). Because Plaintiff is not challenging the propriety of the adverse employment action taken against him, both *Niebur* and *Moran* are inapposite.

Let's suppose, however, that Plaintiff was challenging the propriety of the adverse employment action. If that was the case, two things are clear. First, a *Bivens* action would not be appropriate. *See Richards v. Kiernan*, 461 F.3d 880, 885 (7th Cir. 2006) (observing that there "is no question but that the [Civil Service Reform Act] provides the exclusive remedy for an alleged constitutional violation . . . arising out of federal employment."). Second, this Court would not have jurisdiction over a claim brought pursuant to the Civil Service Reform Act. *See Ayrault v. Pena*, 60 F.3d 346, 348 (7th Cir. 1995)(observing that the only court with jurisdiction over CSRA claims is the Federal Circuit).

In conclusion, Plaintiff's *Bivens* claims must be dismissed. Supposing that a *Bivens* remedy is available, Plaintiff has failed to establish that the Individual Defendants' conduct violated his constitution rights. For that reason, all of the

Individual Defendants are entitled to qualified immunity. *See Alexander,* 692 F.3d at 355.

## II. Counts III and IV – FTCA Claims Against the United States

Plaintiff has also sued the United States under the FTCA for malicious prosecution and intentional infliction of emotion distress. These claims are based upon the actions undertaken by U.S. Marshal McPherson and Special Investigator Shirley both before Plaintiff's indictment and after Plaintiff's indictment.

Collectively, the actions by Shirley and McPherson – McPherson instructing his employees to investigate, questioning Plaintiff, aiding Shirley, and emailing instructions to his employees that they not speak with Plaintiff's attorneys without prior approval, and Shirley aggressively interrogating and threatening witnesses and drafting affidavits with false statements – provide the predicate facts upon which Plaintiff rests his claims of malicious prosecution and intentional infliction of emotional distress. As explained below, the discretionary function exception to the United States' waiver of sovereign immunity in the FTCA applies to all of this behavior. Therefore, Plaintiff's FTCA claims must be dismissed.

### A. The Discretionary Function Analysis

The FTCA waives the United States' sovereign immunity for damages "caused by the negligent or wrongful act or omission" of federal employees acting within the scope of their employment where the United States, "if a private person," would have been liable to the plaintiff under state law. 28 U.S.C. § 1346(b).

However, this waiver of sovereign immunity is not absolute, as Congress has excepted certain claims from the FTCA. This includes "[a]ny claim . . . based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government . . .” 28 U.S.C. § 2680(a). This subsection, known as the discretionary function exception, protects the United States from liability when an activity is properly “classified as an exercise of discretion,” even if the government employee abuses his discretion. *Collins v. United States*, 564 F.3d 833, 839 (7th Cir. 2009).

The exception “marks the boundary between Congress’ willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.” *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984). Its purpose is to “prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.” *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).

For behavior to qualify for the discretionary function exception, it must meet two criteria. First, the conduct must involve “an element of judgment or choice.” *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Conduct that is specifically proscribed by “federal statute, regulation, or policy” is not conduct that involves an element of judgment or choice because “the employee has no rightful option but to adhere to the directive.” *Id.* Second, the conduct must be “susceptible to policy analysis.” *Gaubert*, 499 U.S. at 325. If certain action is discretionary, a Plaintiff “must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in . . . policy.” *Id.* at 324-25.

The United States argues that the FTCA's discretionary function exception bars Plaintiff's claims under one of two theories. First, it argues that Plaintiff's injury is not "distinct from the harm caused by the ultimate prosecution itself," and the decision to prosecute is "uniformly found . . . to be immune under the discretionary function exception." (Doc. 23 at 7 (citing *Gray v. Bell*, 712 F.2d 490, 515 (D.C. Cir. 1983)). Second, the United States argues that each of Shirley and McPherson's alleged acts are quintessentially discretionary and susceptible to policy analysis. (Doc. 23 at 8-13). Plaintiff responds by arguing first that the discretionary function exception does not apply to his malicious prosecution claim, and second that Shirley and McPherson's alleged acts are not discretionary because they either violated the Constitution, were unlawful, or were proscribed by regulation or agency directive. (Doc. 27 at 5-10).

## 1. Law Enforcement Proviso

The Court first addresses Plaintiff's argument that the discretionary function exception does not apply to his malicious prosecution claim. Relying upon an Eleventh Circuit case, *Nguyen v. United States*, 556 F.3d 1244, 1251-56 (11th Cir. 2009), Plaintiff argues that the discretionary function exception categorically does not apply to certain intentional torts committed by law enforcement officers, including malicious prosecution.

This is a matter of statutory construction. Just as 28 U.S.C. § 2680(a) excepts from the FTCA's coverage the discretionary actions of government employees, 28 U.S.C. § 2680(h) excepts a number of intentional torts, including malicious prosecution. *See* 12 U.S.C. § 2680(h). However, in 1974, Congress amended §

2680(h) with what is now known as the law enforcement proviso. *Nguyen*, 556 F.3d at 1251. The law enforcement proviso provides, in part, that, "with regard to acts or omissions of investigative or law enforcement officers . . . the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of . . . malicious prosecution." 28 U.S.C. § 2680(h).

Plaintiff argues that § 2680(a) and § 2680(h) are in irreconcilable conflict: while § 2680(a) exempts from the FTCA's waiver of sovereign immunity "any claim" based on a federal employee's exercise of discretion or failure to exercise discretion, § 2680(h) purports to waive sovereign immunity for "any claim" for malicious prosecution based upon the conduct of law enforcement officers. (Doc. 27 at 6). But what about claims for malicious prosecution based upon the conduct of law enforcement officers who are acting within their discretion? The Seventh Circuit has not directly addressed this question.

In *Nguyen*, the Eleventh Circuit resolved this apparent conflict by concluding that one of the sections must yield to the other. *See* 556 F.3d at 1252. It applied two canons of construction to conclude that § 2680(h) trumps § 2680(a): first, it reasoned that specific statutory provisions trump general statutory provisions and noted that § 2680(h), which applies to six specific intentional torts, is more specific than § 2680(a)'s general exception. *Id.* at 1253. Second, it reasoned that younger statutory provisions trump older provisions, and noted that the discretionary function exception is nearly thirty years older than the law enforcement proviso. *See id.*

Other circuit courts reviewing the question have not been so severe, and instead have accommodated both sections rather than rendering one subsection

inoperative in order to give meaning to the other. *See, e.g., Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001); *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994); *Pooler v. United States*, 787 F.2d 868, 872-73 (3d Cir. 1986), *abrogated on other grounds by Millbrook v. United States*, 133 S. Ct. 1441 (2013); *Gray v. Bell*, 712 F.2d 490, 507 (D.C. Cir. 1983); *Caban v. United States*, 671 F.2d 1230, 1234-35 (2d Cir. 1982). The D.C. Circuit, for example, held that the law enforcement proviso does not waive immunity for discretionary acts. It found "no serious incongruity between the immunity afforded under section 2680(a) and the waiver of immunity under the proviso to section 2680(h)." *Gray*, 712 F.2d at 507. It resolved the apparent dispute by finding that the sections "are neither inconsistent nor mutually exclusive" because the "intentional torts listed under the proviso . . . may be committed without any exercise of a discretionary function." *Id.* The Fourth Circuit agreed with the rationale in *Gray*, and concluded that "actions underlying intentional tort allegations described in § 2680(h), if authorized and implemented consistent with federal law and the Constitution of the United States, may be considered discretionary functions." *Medina*, 259 F.3d at 226.

Although the Seventh Circuit has not directly addressed this issue, its opinion in *Reynolds v. United States*, 549 F.3d 1108 (7th Cir. 2008) implicitly embraces the majority position. In *Reynolds*, a security guard sued the United States, alleging that its investigators "had initiated a malicious prosecution by submitting knowingly false information to the . . . prosecutor." *Id.* at 1110. Before analyzing whether the conduct was an actionable intentional tort pursuant to § 2680(h)'s law enforcement proviso, the *Reynolds* court first considered whether the

investigators' actions were discretionary. *See id.* at 1112-13, 1114. Ultimately, it held that the complained of behavior was actionable because it was not discretionary and fell within the law enforcement proviso. *See id.*

Under Plaintiff's reading of the FTCA, the sequence of the Seventh Circuit's analysis in *Reynolds* would be backward: whether the investigators' conduct fell within the law enforcement proviso (it did) should have answered whether the discretionary function exception applied (it categorically did not). Yet that is not how the court approached the issue. The court addressed the discretionary function exception argument before addressing the question of the law enforcement proviso, and it addressed it independently of the law enforcement proviso by applying the Supreme Court's *Gaubert* factors. *See id.* at 1113.

The Seventh Circuit's approach makes a great deal of sense. By reading § 2680(a) independently from § 2680(h), courts have construed § 2680 "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 313 (2009). Section 2680 provides for thirteen separate categories of exceptions to the Government's waiver of sovereign immunity. *See* 28 U.S.C. §§ 2680(a)-(n). There is ample room for overlap between the provisions. For example, as recognized above, it is possible for a law enforcement officer to engage in discretionary conduct that meets the elements of malicious prosecution. Prior to the addition of the law enforcement proviso, such conduct would have been independently excepted from the reach of the FTCA under at least two of § 2680's subsections – § 2680(a) and § 2680(h). With the addition of the law enforcement proviso, such behavior is no longer excepted from the FTCA's

waiver of sovereign immunity under § 2680(h). But reading § 2680(h) to have no effect on § 2680(a) renders neither subsection void or superfluous.

The Court concludes, along with the majority of courts of appeal and the implied approval of the Seventh Circuit, that the law enforcement proviso does not trump the discretionary function exception. Therefore, both Plaintiff's malicious prosecution claim and intentional infliction of emotional distress claim must overcome the hurdle posed by the discretionary function exception in order to proceed.

### 2. Constitutional Rights

Plaintiff next argues that he can overcome the hurdle posed by the discretionary function exception because he has alleged that both McPherson and Shirley engaged in activity that violated his constitutional rights. In his Complaint, Plaintiff alleges that McPherson's actions violated his Sixth Amendment right to compulsory process of witnesses and his Fifth Amendment right to due process of law, (Doc. 12 at ¶ 56), and that Shirley's actions violated his Fifth Amendment right to due process of law. (*Id.* at ¶ 60). He also argues that both created false evidence, in violation of his Fifth Amendment rights. (Doc. 27 at 9). Seventh Circuit precedent cited by neither party squarely forecloses such an argument.

A number of circuits addressing the discretionary function exception have explained that it is inapplicable when a government actor allegedly engages in activity that violates the Constitution. For example, the First Circuit held that the discretionary function exception does not shield the United States from liability when its agents "participated in framing [plaintiffs] and . . . withheld exculpatory

evidence to cover up their malefactions" because the conduct was "a clear violation of due process." *Limone v. United States,* 579 F.3d 79, 102 (1st Cir. 2009). Other circuits, including the Fourth, Eighth, and Ninth have agreed. *See Medina*, 259 F.3d at 225 (explaining that "federal officials do not possess discretion to violate constitutional rights"); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (concluding that conduct engaged in by the FBI fell outside of the discretionary function exception because the plaintiff alleged the conduct violated his rights under the First and Fourteenth Amendment); *Galvin v. Hay*, 374 F.3d 739, 757-58 (9th Cir. 2004) (holding that discretionary function exception did not apply to police officers who dispersed members from a prayer service because the activity violated the constitution).

The United States argues that for constitutional violations to apply, the Constitution "must *clearly* preclude the specific conduct at issue" because "only *clear and specific* directives or prohibitions . . . will avoid the discretionary function." (Doc. 28 at 5 (citing *Berkovitz*, 486 U.S. at 544)). This argument appears to be an attempt to align the discretionary function exception with the doctrine of qualified immunity. *See Harlow*, 457 U.S. at 818 (limiting individual employees' liability for constitutional torts to conduct that violates "clearly established" constitutional rights); *Castro v. United States*, 560 F.3d 381, 395 (5th Cir. 2009) (Smith, J. dissenting), *rev'd on reh'g en banc*, 608 F.3d 266 (5th Cir. 2010) (arguing that it is nonsensical to treat FTCA claims "more liberally than we treat *Bivens* actions against individual federal officers" who enjoy qualified immunity).

Courts holding that federal employees do not have the discretion to violate the Constitution have not been clear on this point. In a number of cases where courts have explained that government actors do not have the discretion to violate the Constitution, they also held that the complained of conduct violated clearly established constitutional rights. *See, e.g., Limone*, 579 F.3d at 102 (concluding that behavior fell outside of the discretionary function because it was unconstitutional and citing to an earlier decision which concluded the individual actors were not entitled to qualified immunity); *Rich v. United States*, 158 F. Supp. 2d 619, 627 (D. Md. 2001) (concluding that police officers searching for a subject of an arrest warrant in a third-party's home violated the Fourth Amendment, that they did not enjoy qualified immunity because the law was clearly established, and that the search was not discretionary). However, this is not a consistent trend. *See Galvin*, 374 F.3d 757-58 (holding that officers enjoyed qualified immunity for constitutional torts emerging from dispersal of a prayer service because their error "was not unreasonable given the law as clearly established" at the time, but also holding that the discretionary function exception did not apply because the activity violated the Constitution).

In spite of this recent trend of courts holding that it is outside of the discretion of federal employees to engage in behavior that violates the Constitution, the only Seventh Circuit case the Court has located squarely held just the opposite. In *Kiiskila v. United States*, a commanding officer at a military reservation excluded from the reservation a civilian employee in a manner that violated the First Amendment. 466 F.2d 626, 627 (7th Cir. 1972) (per curiam). The Court made short

work of the civilian employee's claim for damages under the FTCA, concluding that she could not recover because "her exclusion . . . was based upon [the commanding officer's] exercise of discretion," which "excepted her claim" from the reach of the FTCA even though it was "constitutionally repugnant." *Id.* at 627-28. This Court is bound by the unequivocal holding of *Kiiskila*. The fact that Plaintiff alleges both McPherson and Shirley violated his constitutional rights does not put their conduct outside of the purview of the discretionary function exception.

## B. Applying the Discretionary Function Exception

Having disposed of these arguments, the Court now applies the discretionary function exception to the facts as alleged by Plaintiff.[4] As explained above, behavior qualifies for the discretionary function if it involves an element of judgment or

---

[4] The Court notes the United States' primary argument is that it cannot be liable under the FTCA when the harm alleged by a plaintiff is indistinguishable from the government's decision to initiate prosecution. It is undisputed that the decision whether to prosecute a person is discretionary. *See Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983). Courts have held that when "a robust act of discretion" intervenes in between the acts of an "alleged government wrongdoer" and a plaintiff's injury, the discretionary function exception protects the government from liability. *See Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1285 (9th Cir. 1998). The Seventh Circuit addressed the applicability of this principle in *Reynolds*, 549 F.3d at 1113. There, it concluded that the discretionary function exception protects government wrong-doing that cannot be meaningfully considered separately from the totality of a prosecution. But when activity is separable from the discretionary decision to prosecute, the discretionary decision to initiate prosecution does not shield that wrongdoing. *See id.* In this case, Plaintiff has not alleged that either McPherson or Shirley corrupted the initiation of the prosecution by lying under oath. However, Plaintiff's claim for intentional infliction of emotional distress is not necessarily dependent upon the initiation of prosecution, and certain complained of actions occurred after the initiation of prosecution. Because they are separable from the discretionary decision to initiate prosecution, the Court considers them independently, under the test enunciated in *Gaubert* and applied in *Reynolds*. *See id.*

choice, is not specifically proscribed by federal statute, regulation, or policy, and is susceptible to policy analysis.

## 1. Pre-Indictment Activities

Plaintiff first argues that McPherson and Shirley manufactured evidence that was used to indict him. As the Seventh Circuit held in *Reynolds*, investigators lack the discretion to "fuel [a] prosecution with knowingly false information." 549 F.3d at 1113. However, Plaintiff does not allege that prior to the indictment McPherson and Shirley "created evidence that they knew to be false." *See Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). Instead, Plaintiff argues that McPherson created false evidence by taking "the extraordinary step of directing [his employees] to go interview [Plaintiff's alleged victim] about the allegations" and then sent his employees back to take additional pictures of the victim after receiving a report that the victim did not have any injuries to his face and receiving a picture of the victim's face." (Doc. 12 at ¶ 24). Plaintiff also alleges that Shirley, together with AUSA's Cha and Blumberg, created false evidence when he "routinely intimidated and harassed witnesses and threatened prosecution in an effort to coerce witnesses to testify favorably." (*Id.* at ¶ 34).

As the Seventh Circuit recently held in *Petty*, these sorts of allegations, although packaged by Plaintiff as allegations of evidence fabrication, are not allegations of evidence fabrication. Rather, at very best for Plaintiff, they are allegations of coerced testimony. *See id.* at 422; *Fields*, 740 F.3d at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up;

it is invariably false."). Investigators may fabricate evidence by creating evidence "that she knows to be false," but that is a different proposition from "getting 'a reluctant evidence to say what may be true.'" *Petty*, 754 F.3d at 422 (quoting *Fields*, 740 F.3d at 1112). In *Petty*, the plaintiff alleged that police officers "coerced [a witness] into giving false evidence by threatening him with jail time . . . holding him against his will in a locked room without food or water for over 14 hours, badgering him, and pressuring him to identify [the plaintiff] as one of the assailants." *Id.* at 423. The Seventh Circuit recognized that this is "different than alleging that [the police officers] created evidence that they knew to be false." *Id.*

In this case, Plaintiff has not pled that either McPherson or Shirley created knowingly false evidence prior to the indictment. When McPherson's agents interviewed Plaintiff's alleged victim, they asked him about the alleged assault on three separate occasions before he said anything about it, and the alleged victim said a "Cicero police officer had hit him." (Doc. 12 at ¶ 24) Upon receiving this report, Marshal McPherson did not direct his agents to create evidence that Plaintiff had hit the alleged victim. Instead, the Complaint alleges that he directed them to collect further evidence by "tak[ing] more pictures of him." (*Id.*). When Shirley interviewed witnesses, Plaintiff alleges that he attempted to "coerce witnesses to testify favorably for the government and dissuade them from testifying in favor of Deputy Linder," and that he successfully convinced "witnesses to change their story." (*Id.* at ¶ 34). This sort of allegation falls on the coercion side of the line rather than the fabrication side of the line, as Plaintiff has alleged coercive

interrogation techniques rather than the creation of evidence that is known to be absolutely false. *See Petty*, 754 F.3d at 423.

### a. Discretionary Nature of Shirley's Pre-Indictment Activities

The United States argues that it was in Shirley's discretion to conduct his investigation in the manner that he did. It cites to the Code of Federal Regulations, which authorizes the Inspector General to conduct investigations "relating to criminal wrongdoing . . . of Department [of Justice] employees . . . as are, in the judgment of the Inspector General, necessary or desirable;" access "all records . . . or other material available to the Department and its components that relate to" the investigations; obtain "information from Federal government agencies by means other than subpoena and advise the head of such agency whenever information is unreasonably refused or not provided;" and obtain affidavits "whenever necessary in the performance of the function of the OIG." 28 C.F.R. § 0.29h(a), (d), (g), (k). It asserts that the law affords OIG Special agents such as Shirley discretion, rather than a precise and optionless directive, as to how they can set up interviews, cooperate with U.S. Marshals, obtain evidence, and interrogate witnesses.

Plaintiff does not dispute this characterization, but instead chooses to argue that the OIG lacks the discretion to manufacture knowingly false information. As demonstrated above, Plaintiff has not properly pled such facts. Therefore, the Court concludes that Shirley acted within his discretion in determining how to conduct his investigation. *See Reynolds*, 549 F.3d at 1113 (observing that "challenges to the quality of an investigation . . .are generally barred by the discretionary-function exception.); *O'Ferrell v. United States*, 253 F.3d 1257, 1267 (11th Cir. 2001)

(explaining that "[j]ust how law enforcement agents are to conduct interrogations would appear to be a paradigmatic example of a discretionary function," even when agents engage in "an indefensibly gross abuse of their discretion" because it "involves elements of judgment and choice.").

### b. The Discretionary Nature of McPherson's Pre-Indictment Activities

The United States similarly argues that McPherson acted within his discretion when he directed his staff to question the alleged victim and when he interviewed Plaintiff after receiving the report of the incident. Plaintiff alleges that this activity violated the Marshals Service's Policy Directive 2.2 on Misconduct Investigations. Policy Directive 2.2 provided McPherson with a clear obligation to "immediately report all misconduct allegations" to the U.S. Marshals Service's Office of Inspection. It also refers to certain rights that employees have during a misconduct investigation.

Plaintiff argues that the portion of the Policy Directive requiring that McPherson immediately report alleged misconduct to the Office of Inspection effectively prohibited McPherson from doing anything other than report the misconduct complaint. The Complaint also alleges that no one advised Plaintiff of his rights when he was informally interviewed. (Doc. 12 at ¶ 23).

Plaintiff's argument is untenable. The Complaint admits that Chief Deputy Marshal O'Malley complied with directive by immediately forwarding the report to the USMS Office of Inspection. (*See Id.* at ¶ 21). A directive requiring that McPherson report misconduct allegations to the Office of Inspection would only provide a "precise and optionless" directive to not engage in any sort of preliminary

investigation if it expressly limited McPherson's actions. *See Berkovitz*, 486 U.S. at 554 (explaining that the discretionary function does not apply when an agency failed to "act in accord with a specific mandatory directive."). However, there is no such express limitation in the directive, only an instruction with which the Marshals Service admittedly complied. Absent specific directives instructing otherwise, McPherson's extracurricular activity, by definition, was discretionary.

Second, any rights that Plaintiff might have during a misconduct investigation did not apply when McPherson interviewed him because there was no misconduct investigation at the time of the interview. The Complaint admits that the OIG did not open an investigation until, at the earliest, July 26, 2010. (*See* Doc. 12 at ¶ 26). McPherson interviewed Plaintiff two weeks before that, on July 12, 2010. (*See Id.* at ¶ 22). Therefore, McPherson's pre-indictment activities, like Shirley's, were discretionary.

## 2. Post-Indictment Activities

This leaves McPherson and Shirley's activities post-indictment: McPherson's emails and the affidavits that Shirley drafted. The United States argues that McPherson's email to staff was discretionary because he sent it in his official capacity as a presidentially-appointed United States Marshall in an effort to provide his employees with guidance as to what they should or should not have been doing and maintain efficient operations of the Marshal Service. (Doc. 23 at 12). The Court agrees with the United States that sending such an email is a task associated with "day-to-day management," which "regularly requires judgment as to which of a range of permissible courses is the wisest." *Gaubert*, 499 U.S. at 325.

Shirley's affidavits require a bit more analysis. Plaintiff maintains that Shirley knowingly manufactured evidence by drafting affidavits with knowingly false statements that were ultimately signed by witnesses and submitted to the district court prior to its hearing on the motion to dismiss the indictment. *See Reynolds*, 549 F.3d at 1113. The United States responds by arguing that *Reynolds* is inapposite because the witnesses signing the affidavits, and not Shirley, would be responsible for any falsity they contained.

The United States' attempt to distinguish Shirley's behavior from the behavior in *Reynolds* is not convincing, as Shirley would be unable to fully disclaim responsibility for false statements that he knowingly included in affidavits he drafted. *Cf. Resolution Trust Corp. v. Bright*, 6 F.3d 336, 341 (5th Cir. 1993) (explaining that attorneys violate disciplinary rules by asking witnesses "to swear to facts which are knowingly false"). However, this does not take Shirley's actions outside of the discretionary function exception. The only allegedly knowingly false statements that Shirley included were statements that USMS employees "did not have any information that would be helpful to the defense." (Doc. 12 at ¶ 41). In the affidavits, Shirley characterized what the swearing witnesses either knew or did not know as either helpful or unhelpful to Plaintiff's criminal defense. Such a decision is discretionary. *Cf. Moore v. Valder*, 65 F.3d 189, 217, 217 (D.C. Cir. 1995) (holding that determining "whether information is 'exculpatory' and 'material' and therefore must be disclosed pursuant to a *Brady* request" requires the exercise of professional judgment and is "quintessentially discretionary"). For these reasons, the Court

concludes that both McPherson and Shirley's post-indictment activities were discretionary.

### 3. Susceptibility to Policy Analysis

The Court has concluded that both McPherson and Shirley exercised discretion when they engaged in each activity upon which Plaintiff bases his FTCA claims. Next, the Court must consider whether McPherson and Shirley's acts were "grounded in policy." *Gaubert*, 499 U.S. at 324. Courts are to presume that the acts are grounded in policy, and Plaintiff must overcome the presumption by alleging facts that "support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in . . . policy." *Id.* at 324-25. Plaintiff has done nothing to rebut this presumption. In his response to the United States' Motion to Dismiss, Plaintiff did not argue that McPherson and Shirley's activities were not grounded in policy. (*See* Doc. 27 at 10). The Court concludes that both McPherson and Shirley's activities were susceptible to policy analysis. Both conducted an investigation into an employee's wrong-doing, and investigations "clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996). And McPherson sent one email and authorized a second as part of his responsibilities involving day-to-day management of the U.S. Marshals Service. *See Gaubert*, 499 U.S. at 331-31 (explaining that "day-to-day management" is susceptible to policy analysis). Because both McPherson and Shirley made these discretionary decisions in the course of implementing their job responsibilities, and because the decisions were

directly related to their job responsibilities, the Court concludes that the decisions were susceptible to policy analysis. *See Collins*, 564 F.3d at 840.

Therefore, the Court concludes that each of the challenged actions taken by McPherson and by Shirley were actions exempted from the FTCA by 28 U.S.C. § 2680(a). For that reason, Plaintiff's FTCA claims must be dismissed.

### CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motions to Dismiss (Docs. 13, 23) are GRANTED. CASE TERMINATED.

Entered this 29th day of January, 2015.


s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge